FRED NISSEN et al., Appellees, v. INTERNATIONAL BROTHERHOOD etc., A. F. of L. Local Union 650, et al., Appellants.

No. 45168.

JANUARY 21, 1941.

REHEARING DENIED JUNE 20, 1941.

Swisher, Swisher & Cohrt, for appellees.

C. I. McNutt and John Connolly, Jr., for appellants.

BLISS, J.—The plaintiffs were all members in good standing, with all dues and charges paid to June 1, 1939, and, with respect to two of them, to July 1, 1939. They were truck drivers or employees of McCoy Truck Lines, Inc., engaged in interstate and intrastate hauling of merchandise. Because of the discharge by the company of Verner Ball, a truck driver, a strike was called against it by defendants Cronin and Early of the Local Union, at 4 p. m. on Friday, May 19, 1939. The next day the employing company filed its petition for injunctive relief against all parties who are named as defendants herein. A temporary writ was issued by the clerk of the court, upon the order of Judge Lovejoy, directed to the defendants, stating:

"[You] are hereby strictly enjoined and restrained from: enforcing the Strike Order issued as alleged in plaintiffs' petition * * *; or from calling a strike and enforcing [sic] and also mandatory injunction requiring them to cancel and annul a strike call, if any has been issued involving any of the employees of the defendants [plaintiff], who are members of A. F. of L. Local Union No. 650, until further order of said District Court in the premises." The writ was served at 2:30 p. m. on May 20, 1939, upon Early, and at 5 p. m. of that day upon Cronin. He testified that upon the issuance and service of the injunction he immediately "cancelled and annulled the strike" and directed all the members of the union that he contacted that they had a right to go back on their jobs and drive their trucks. He further testified that "Hall, the manager of the Truck line had a perfect right to call his men back to work after that, at any time." He also testified that the service of the injunction "ended my participation in the strike. As far as Local 650 was concerned, its members and officers, that ended the strike." The period of the strike, counting from the issuance of the strike order to the order of annulment, was from 4 o'clock in the afternoon of Friday, May 19, 1939, to Saturday, May 20, 1939, at 2:30 o'clock in the afternoon. Some of the plaintiffs may have been on the road when the strike order was given, but none of them took a truck out during the period of the strike. They did not return to work until they were called by their employer and told that the strike was off because of the injunction, and directed to resume their work. This they did. By agreement of the parties to the injunction suit it was settled and an order of court dismissing it and quashing the writ was entered on Monday, May 22, 1939.

On May 27, 1939, the following registered letter, on the stationery of the Local Union, was mailed to the addressees, to wit:

"Fred Nissen, G. R. Agnew,
"Dear Sir and Brother:
"You are hereby notified to appear before the Executive Board of the Teamsters and Chauffeurs Local No. 650 of Waterloo, Iowa, Wednesday Night May 31, 1939, at 7:30 P. M. at 400 W. Park Ave., *for violation of the constitution of the Inter-*

*national Union* of which you are a member. [Italics ours.] The constitution provides that whether or not you are present at your hearing, your case will be heard and a penalty will be set for your violation. We advise you to be present to defend yourself.

"Fraternally yours,
"Ed Early—Sec. and Treas.,
"Teamsters and Chauffeurs,
"Local No. 650, Waterloo, Iowa."

Each of the other plaintiffs received an identical letter, about the same date. Nissen was about to leave with his truck for Chicago when he received his letter, and he telephoned Early and asked for a postponement of his hearing for a day or two until his return. Early refused the request but never told the executive board anything about it. None of the plaintiffs had, or had ever been given, copies of the constitution and bylaws. No writing specifying the charges against any of the plaintiffs, nor any written charge of any kind was given to any of them at any time, although section 92 of the constitution provides:

"Any member or Local in good standing, or the General Executive Board (of the International), may prefer charges *in writing, setting forth the facts constituting such charges.* Charges against a member shall be preferred in duplicate to the Executive Board of the Local Union. *It shall notify the accused by registered letter containing a copy of the charges and the time and place set for the trial,* and give the defendant at least two weeks to prepare for trial, but charges for violation of Sections 88 and 90 shall be tried as there prescribed. * * *." (Italics are ours.)

There was no compliance with this section. No copy of any charge was produced, either duplicate or original, though demand was made for such production at the trial. No officer of the Union or member of the board, as a witness, could recall of ever having seen a written charge, or the name of any person who made such a charge. When Early wrote the letters to Agnew, Nissen, and the other plaintiffs, he had no written record of any

motion, resolution, or authorization from the executive board directing him to do so. He said it was on a vote on a motion, but he had no record or recollection of the vote or who made the motion.

Section 90 of the constitution is as follows:

"Any member who knowingly goes to work or remains in the employment of any person, firm or corporation whose men are on strike or locked out, unless he has permission of the International, the Joint Council or his Local Union, may be tried by the Executive Board of his Local Union, *on written charges by giving him written notice of the charges and the time and place of trial, allowing a reasonable time for the defendant to reach the place set for trial.* [Italics are ours.] If he does not answer trial, the Executive Board may proceed in his absence, and if he is found guilty he shall be punished by suspension, which shall take effect on the date of the commencement of the offense, at which time he forfeits all rights, privileges and benefits in the organization.

"He may appeal to the Joint Council, but pending the appeal the verdict is binding."

There is testimony that this section was read at the hearings of the plaintiffs. They were asked why they went back to work and each replied that he thought he had a perfect right to do so since the strike was annulled or suspended by the order of the court. They were asked to step out of the room and on being recalled were told that they were suspended, and their membership cards should be turned in. Agnew testified: "They took my card and told me when they saw fit to give it back they would, if they saw fit." Plaintiff George Oldenburger testified: "I had my dues paid up to June 1, 1939. After they pulled my card, I went to Mr. Early and asked if I could keep paying on my card or keep paid up and he said No, that I lost all of my rights." Two others of the McCoy truckers, Hall and Carter, were also called to the hearings. Like the plaintiffs, they had also taken out trucks after the injunction, and, if the plaintiffs had offended, these two were just as guilty. As the plaintiff Long and Carter left the hearing, Long asked Carter if they had suspended him, and, on being told that they

had not, Long went back to the hearing and asked why they had taken his card and not Carter's. He testified: "They told me Carter was a stronger union man than I was."

The so-called trials of plaintiffs were held on May 29, May 31, and June 1, 1939. The notice to each of them was about two days. The minutes of the executive board for each of these meetings showed the following entry as to each man and each case, with the exception of the name of the accused: "Decisions: In Trials of (McCoy & Co.) Drivers who were charged with violations of *Section No. 90* of our International Constitution and By-Laws. Chas. Long. To be suspended indefinitely. To be reinstated at such time as the Executive Board sees fit." (Italics ours.)

On the 14th day of December, 1938, the defendant Union, International and Local, executed what is termed an "Over-The-Road-Motor-Freight Articles of Agreement," effective October 1, 1938, to and including October 31, 1939, with the McCoy Truck Lines, Inc., covering the wages and working conditions of the members of Local No. 650 in the employ of the McCoy Company. Article 1 thereof is as follows:

"The Union shall be the sole representatives of those classifications of employes covered by this agreement in collective bargaining with the Employer. *Only members of the Union or men eligible for membership may be hired.* [Italics are ours.] The employer shall call the Union for additional men when required provided, however, that if the Union does not have suitable men available, a non-member should be hired with the understanding that he must make immediate application for membership in the Union and shall work under the provisions of this agreement. Any person newly employed shall be so employed only on a thirty day trial basis, during which time he shall either be dismissed without further recourse or placed on the regular seniority list."

Plaintiffs filed their petition in equity in this suit on June 6, 1939, praying for a writ of mandamus ordering their reinstatement as members in good standing of the Union, and judgment for damages for loss of time, and also for the humiliation suffered. Defendants made a number of attacks on the petition. First they moved to dismiss the suit, because of the misjoinder of a law, and

an equity, cause. Next they moved to strike such allegations, and so much of the prayer, as related to a money judgment, and asked for a jury trial on the issue of damages. Then they moved that the trial proceed upon the equitable issue of mandamus, and that the matters of law be transferred to the law side of the calendar for a jury trial. These motions were all overruled in turn by Judge Hasner. Thereafter defendants moved that plaintiffs be required to elect upon which cause of action they were proceeding. The motion was overruled.

On July 25, 1939, plaintiffs amended their petition by alleging that defendants Early, Gindt and Cronin, in addition to their capacity as officers and representatives of the Local Union, and individually, were made defendants herein as representatives of the members of the Union, who were so numerous that it was impracticable to join them all individually as defendants. (The record shows that the number varied from 273 on May 1, 1939, to 354 on July 26, 1939.) Defendants' motion to strike this amendment because the numerous members not served were not before the court was overruled. Answers were filed by all of the defendants raising again the questions involved in their motions, alleging, among other matters, that the orders of suspension were discretionary with the Union and its officers; that plaintiffs had a remedy under the constitution of the International of appeal to the general executive board, which they did not exercise; that the defending officers have no power to reinstate the plaintiffs, since they are only two of the seven members of the executive board; that the International Brotherhood, A. F. of L. Local No. 650 is an unincorporated association without legal entity, and the court is without jurisdiction to enter any order or judgment of damages against it; that by becoming members of the Union they are subject to the rules, bylaws, constitution and ritual of the organization, and must abide thereby; that plaintiffs have a plain, speedy and adequate remedy by appeal to the general executive board; that mandamus is not a proper remedy to undo a wrong, if any, already committed; that the injunction was illegal and void and violated the constitutional rights of defendants, under both the federal and state constitutions. In their reply, plaintiffs alleged that the defendant International and Local No. 650 contracted as an entity with the employer of plaintiffs respecting

the conditions of their employment, representing and holding itself out as an existing entity capable of contracting and being bound thereby, and it is thereby estopped to claim otherwise. Trial was had before Judge Wood, and the writ was issued as prayed, and judgment was rendered for approximately $2,600 in the aggregate for actual damages, and the further sum of $100 for each plaintiff for humiliation suffered as a result of the illegal suspension. The defendant officers and their successors were ordered to deposit such funds of the Union in their possession, or which might thereafter come into their possession, with the clerk of court until the satisfaction of the judgment. The defendants made a return to the writ stating that in compliance therewith they had restored the plaintiffs to membership, but without prejudice to any rights of appeal.

Appellants in this court have assigned 18 grounds for reversal, and have argued at length numerous questions of law, with a great many authorities cited in support.

As we view the case and the record, the determinative and decisive issues are largely those of fact. Since our determination of these will dispose of most of the legal questions argued, we will direct our attention somewhat further to the facts.

The chief question in this case is whether there is any basis for the charge, or any evidence of substance to support it, that the plaintiffs, or any of them, had violated the constitution of the International Brotherhood of Teamsters, etc. It may be noted that the Local Union had no constitution or bylaws other than those of the International. We say without hesitation that the record and the evidence is overwhelmingly to the contrary. Directing attention first to the matter of the strike and the injunction. Defendants allege that the injunction was illegal and void. The court in that suit, through Judge Lovejoy, basing its order solely upon the verified petition, supported by the affidavit of the manager of the McCoy Company, found the strike was unlawful. The prima facie showing was ample to sustain the order, in our judgment. Defendants objected to the introduction of the files in that cause, but under the allegations of the petition and answers, we think they were admissible. The evidence in the case before us fully justifies the order of Judge Lovejoy. Verner Ball, whose discharge called forth the strike

order, was a material factor in this trouble. Article No. 15 of the agreement between the Union and the McCoy Company provided as follows:

"The Employer shall not discharge any employe without just cause and shall give at least one warning notice of the complaint against such employe except that no warning notice need be given to an employe before he is discharged *if the cause of such discharge is dishonesty or drunkenness while on the job.* [Italics are ours.] Any employe may request an investigation as to his discharge and should such investigation prove that an injustice has been done an employe, he shall be reinstated and compensated at his usual rate of pay while he has been out of work. Appeal from discharge must be taken within five days by written notice and a decision reached within ten days from the date discharged."

Complaint of his conduct had been made to the Union and at a hearing on April 2, 1939, the employee had been sustained. The employer alleged that on his return he was more insubordinate, breached important rules, some in violation of state laws. Undisputed testimony as to his drunkenness was given in the case before us. This under the quoted section would have justified his discharge without notice. The employer again complained to the Union, and, after a delay of three weeks in which no definite action was taken by the Union, discharged him subject to a hearing. Defendants Cronin and Early notified the employer to reinstate him or they would call a strike. The employer refused. Article No. 7 of the said agreement provided: "The Union and the Employer agree that there shall be no strike or lock-out without first using all possible means of peaceful settlement of any controversy which might arise." The defendant officers might well have given more consideration to this section. They issued the strike order and that evening they had an informal meeting of the McCoy drivers, including plaintiffs, held in part at a beer tavern and in part in the hall of the Local, at which these officers urged the importance of standing behind Ball. All of the plaintiffs had supported Ball at the first hearing on April 2d; but, at this second meeting on May 19th,

some of them objected to going out on a strike in support of Ball, because of his repeated misconduct.

Section 60 of the constitution provides that, when any difficulty arises between the members of a Local Union and their employers, and it is not adjusted by committees, they shall proceed as provided by section 61 of the constitution. This section is:

"If a settlement cannot be reached the Union shall, at a summons meeting, order a secret ballot to be taken, and it shall require a two-thirds majority of all members of the Union present to adopt a motion to strike. The ballot taken must be 'Yes' or 'No' written on paper ballots."

There was no attempted, or even pretended, compliance with this section. There is no authority in the constitution or bylaws of the International, or in the rules, regulations or ritual of the Local, to call a strike in any other way. There was no record of such a summoned meeting or such a ballot. No member of the Union was called to testify to participation in such a meeting or ballot, except the plaintiffs and they testified that they had never heard of such a meeting. The witness Cronin then intimated that the Ball hearing of April 2d was such a meeting, but the minutes of that meeting and his testimony on cross-examination refuted any such claim. He then, over proper objection that it was hearsay, testified that in this particular strike, there was procedure "taken up to the area committee in Chicago, back to the State Council, and the Executive Board, and to the employees involved prior to the time of the strike." Then this interrogation took place:

"Q. The Constitution and By-laws don't give the area committee any jurisdiction in this strike called here do they? * * * A. Not to my knowledge.

"Q. No, and this strike was, so far as the men were concerned, called by your telling the men there was a strike on, and not to go to work? A. Per instructions.

"Q. Insofar as the men were concerned, that is all they knew about it? A. I say we had a meeting with the men on April 2d.

"Q. You didn't have any vote? A. We had the voice of all the members present.

"Q. Yes, and the Constitution provides, if the members of the Union are going to go on a strike, they have a vote, a written vote, Yes or No? A. Providing they receive financial benefits.

"Q. There isn't any other provision for the men to *vote except by written vote, Yes or No?* A. *No.*

"Q. *And there wasn't any such vote on this strike?* A. *No.*"

There is no evidence to the contrary. Mr. Cronin, who participated with Mr. Early in calling this strike, had no authority under the constitution to even vote on calling a strike. The record clearly establishes that the strike was called wrongfully and contrary to the provisions of the constitution and by-laws and of all rules and regulations of the Local Union.

But even had the strike been properly and rightly called there is no evidence that any of the plaintiffs during the period of strike violated the provisions of section 90 of the constitution by going to work. The evidence is all to the contrary. None of them went to work until after the injunction and the annulment of the strike, and after Cronin had stated that they might return to work.

Having failed to show that these men had violated section 90 of the constitution, an attempt was made at this trial to prove that they had also been charged with a violation of sections 88, 89 and 91 of the constitution. The recorded decisions in each case which we have already set out conclusively prove that the only claimed violation was of section 90, but Mike Moody, who kept the minute book of the executive board, testifying for defendants further confirmed this by stating: "The entries in the minute book show the date of trial of each one of the persons, and it also shows that each and every one of them were tried for the violation of *Section 90.*"

One offense with which they were not charged and for which they were not tried was disloyalty to the Union. With the help of Mr. Verner Ball, the cause of all of the trouble, Cronin said:

"We made a check up on the attitude of these men toward the Union. It wasn't so much the men going out that left them in bad status with the Union, but it was their attitude toward the Union prior to the injunction. *They saw fit to associate with the employer*, they saw fit to take tires out on the highway for the employer. The plaintiffs made no effort whatsoever to contact me or any members of the Executive Board after Friday night."

Mr. Gindt, the president of Local No. 650, after conceding that there was no disloyalty in the men's going to work after the injunction, gave this testimony:

"Q. Yes, that is right, and the same thing is true of all, each one of these other men, isn't it, that you didn't have a violation of the constitution for any one of these men, to try them for, and you tried them, and suspended them and took their cards, for something that wasn't a violation of the constitution, that is true isn't it? A. That is true.

"Q. And it wasn't a violation of any rule or regulation of Local 650, ever adopted, was it? A. No."

Gindt also claimed that the men refused to do picket duty at the McCoy strike, but this is completely refuted by testimony of Cronin, who testified: *"We didn't create a picket line that day.* The employees involved, some of them, went to the office of the employer, others went on their way, and Putnam and myself talked to the trucks coming in there."

In answer to the question "So any hearing that was participated in against any of these plaintiffs was a hearing that was not authorized by the Constitution and Bylaws or rules of your Local 650?"; Mr. Cronin replied "Yes."

With respect to the failure of defendants to comply with the constitution requiring the filing of specific charges, Mr. Gindt testified:

"Q. Were there any written charges filed against any of these plaintiffs, any one of these truck drivers? A. No, I cannot say that there was.

"Q. You don't have in your office, and never did have a written charge by anybody against any of these six men, do you? A. No sir.

"Q. And you were present at the hearings, and took up their cards, and no charge had been filed in accordance with the Constitution against any one of them, that is true, isn't it? A. Yes, sir.

"Q. And you took up Nissen's card and he never had an opportunity to be there, and yet you held up a meeting to decide something for Ball for three weeks, because he couldn't be there, and you wanted to be fair and give him an opportunity to be heard?" The answer was "Yes, sir" to both questions.

I. Under the record, the hearings were wrongful and unlawful and without jurisdiction. In such a situation the decisions at the hearings were not an exercise of a legal discretion, but were without and beyond discretion. They were not merely erroneous conclusions, but were without legal authority, warrant of law, or jurisdiction. In such case mandamus is a proper remedy. It will also lie where there is an abuse or arbitrary use of discretion, or the action complained of was unreasonable, arbitrary, and in excess of power. See Pierce v. Green, 229 Iowa 22, 38, 39, 294 N. W. 237, 248, and authorities cited therein, and also Miller v. Hanna, 221 Iowa 56, 61, 265 N. W. 127, 129.

The action of mandamus is one brought to command "the performance or omission of which the law enjoins as a duty resulting from an office, trust, or station." (1939 Code, section 12440.) The Union and its officers in their capacity as stated in the statute owed a duty to the plaintiffs to right the wrong committed against them by reinstating them to membership in the organization. Appellants argue that mandamus does not lie to undo a wrong already committed. The statute requires the issuance of the writ whether the duty be violated by a wrongful act or wrongful failure to act. Had the Union, when the men applied for membership, accepted their entrance fee and taken them in, but refused to issue them their cards, mandamus would have been available to compel. As it is, the cards were

issued but were wrongfully taken up. Why should not manda-mus lie to compel the reissuance of the cards, and the reinstate-ment of the men? The trial court answered the question cor-rectly.

II. Appellants also urge that plaintiffs have a plain, speedy and adequate remedy by an appeal to the general execu-tive board of the International at Indianapolis. There is some hearsay testimony that this board would send out an agent to investigate, but Mr. Cronin admitted that the constitution pro-vided that the trial of such an appeal shall be at Indianapolis. The constitution gives little information as to the procedure on such an appeal. Certainly it is neither as plain, speedy or adequate as mandamus, nor is it "in the ordinary course of the law," as provided by Code section 12446.

III. Appellants insist that plaintiffs should have ex-hausted the remedies of appeal afforded by the tribunals within the Union as provided by section 92 of the constitution. This section provides that a member *may* appeal to the joint council. There was no joint council in Waterloo. It further provides that where no joint council exists either party *may* appeal to the general executive board of the International. Section 35 of the constitution provides that "the General President, General Sec-retary-Treasurer, and First Vice-President of the International Brotherhood shall have the power to call a meeting of the Gen-eral Executive Board *whenever in their judgment they deem it necessary.*" (Italics ours.) Of a similar provision, the Court of Chancery of New Jersey in Walsche v. Sherlock, 110 N. J. Eq. 223, 231, 159 A. 661, 665, said: "Broad powers are given to the board itself, but not to individual members of the locals. If complaints are made, they may be considered as a matter of grace, but not of right; and it is to be noted that the meetings of this board are held 'when necessary' at the call of the president. There is no assurance to the complainants that the president would *ever* call a meeting." This appeal is permissive only and the plaintiffs did not agree or bind themselves to pursue this remedy. Such remedies need be exhausted before resort to the courts only where the question is purely social, involving disci-pline or the conduct or standing of a member. But, if property rights are involved, in the absence of an express agreement to

exhaust the remedies provided within the association, the member may resort to the courts without using the within-the-Union remedies. And where property rights are involved the member need not first pursue the remedies within the association, if they would be futile, illusory, or vain. Walsche v. Sherlock, 110 N. J. Eq. 223, 225, 226, 159 A. 661, 663; Lindahl v. Supreme Court I. O. F., 100 Minn. 87, 110 N. W. 358, 8 L. R. A., N. S., 916, 117 Am. St. Rep. 666; Brown v. Supreme Court I. O. F., 176 N. Y. 132, 68 N. E. 145; Ray v. Brotherhood of Railroad Trainmen, 182 Wash. 39, 44 P. 2d 787; Lo Bianco v. Cushing, 117 N. J. Eq. 593, 603, 604, 177 A. 102, 107; Collins v. International Alliance, 119 N. J. Eq. 230, 247, 182 A. 37, 46; McCantz v. Brotherhood of Painters, Tex. Civ. App., 13 S. W. 2d 902, 904.

Also, if the action of the association is wrongful, or without jurisdiction, or is without notice or authority, or not in compliance with the rules or constitutional provisions, or is void for any reason, the obligation to appeal within the order is not imposed, but the complaining one may resort directly to the courts. The rule contended for is applicable only when the organization has acted strictly within the scope of its powers. Rueb v. Rehder, 24 N. M. 534, 546, 174 P. 992, 995; Bacon, 1 Benefit Societies, 3d Ed., section 107; Mulroy v. Supreme Lodge, 28 Mo. App. 463; Ray v. Brotherhood, supra; 19 R. C. L. 1231, section 41, page 1253; Hall v. Morrin, Mo. App., 293 S. W. 435; State ex rel. Weingart v. Board, 144 Wis. 516, 517, 518, 129 N. W. 630, 631; People v. Order of Foresters, 162 Ill. 78, 44 N. E. 401; Walsche v. Sherlock, supra; Von Arx v. San Francisco Gruetli Verein, 113 Cal. 377, 45 P. 685; Polin v. Kaplan, 257 N. Y. 277, 177 N. E. 833; Dingwall v. Amalgamated Assn., 4 Cal. App. 565, 88 P. 597; Abdon v. Wallace, 95 Ind. App. 604, 165 N. E. 68, 75; Gardner v. Newbert, 74 Ind. App. 183, 128 N. E. 704; Cox v. United Brotherhood of Carpenters, 190 Wash. 511, 69 P. 2d 148.

■ IV. Appellants also contend that certiorari instead of mandamus is the proper remedy. There is no merit in this. Certiorari is merely a writ of review to determine legality. Mandamus is a coercive remedy. Such a remedy was required in this case. See Pierce v. Green, 229 Iowa 22, 49, 294 N. W. 237, 253.

■ V. It is also urged that no demand was made before suit. We think that plaintiffs did all that was necessary in this respect.

It is also quite apparent that any further demand would have been futile.

VI. Contention is also made that the defendant Union being an unincorporated association has no legal entity and can neither sue nor be sued, and that the court erred in rendering a money judgment for damages. The appellees answer that the Union is suable, and subject to a money judgment; that the membership of the Union as a whole was sued in a representative capacity through those members named as defendants, and that the Union by entering into the McCoy contract as an entity is estopped to urge its nonentity.

Counsel for appellants have ably presented their position by argument and authority, although the support of many of these authorities is more apparent than real. We have studied all of them and others and it is our considered judgment that the record here made, logical reasons, sound principles of law, economics, general welfare, and the better authorities, are all on the side of the appellees on this question.

We do not question the general rule urged by appellants that voluntary, unincorporated associations cannot sue or be sued, as such. This court has so stated and held in numerous cases and under the facts the cases were rightly decided. But this rule does not mean that because such an association cannot sue or be sued, in or by its *name alone,* its rights and duties are not subject to judicial examination. Such an association, organization, union or society has its rights, obligations and responsibilities, which rights it may enforce by appropriate procedure, and it follows as a logical necessity that it may be held accountable for its obligations and responsibilities. We have so held a number of times. Just recently, in the case of Lamm v. Stoen, 226 Iowa 622, 284 N. W. 465, 121 A. L. R. 627, the question is discussed generally by Justice Oliver. It was there held that a landlord who had all the benefits of a lease with a voluntary, unincorporated literary and social club, could not avoid the obligation of a renewal option in the lease, simply because the society itself could not contract, sue, or be sued. It will be noted in that case that the suit was not against the society, by name, alone, but the defendants were four individuals as officers and

members of the society, individually, and in their representative capacity for the entire membership of the society. The procedure was proper and the decision right. The decision followed an earlier holding of this court in Reding v. Anderson, 72 Iowa 498, 499, 34 N. W. 300, in which the landlord sued to enjoin the members of a Grand Army Post, an unincorporated association, from using the leased premises. He made the Post Commander, who signed the lease as such, and other members, defendants. In denying relief, the court stated the governing principles, and with reference to the lease, said: "It expresses a contract renting the hall to *the post*, which *is bound thereby to pay rent*." (Italics ours.)

In Presbyterian Church of Osceola v. Harken, 177 Iowa 195, 203, 158 N. W. 692, 695, suit was brought to enjoin defendants' interference with the use of a church property. The church was unincorporated. Defendants challenged plaintiffs' right to sue, upon the ground that the church was not a legal entity. Intervenors joined with plaintiffs in asking the same relief. The suit was prosecuted by the church in its own name, and by its trustees, as trustees of an express trust for all of the beneficiaries. The intervenors asked relief for and on their own behalf and also on behalf of all of the members of the church, who it was alleged, were so numerous that it was impracticable to bring them all into court. The court held the suit was properly brought "and that defendants' objection to their right to sue is without merit."

The correct procedure in suits in behalf of or against unincorporated associations, organized for profit or nonpecuniary, was first stated by this court, we believe, in Keller & Bennett v. Tracy and The Catholic Church, 11 Iowa 530, 531. It was a proceeding to establish a mechanic's lien against a church building. Because of the failure to make the Catholic Bishop a party, or to allege the incorporation of the church, or that Tracy was a member, relief was denied. The court thus announced the rule:

"The church if incorporated, should have been sued by its corporate name. If not, the individual members of the church might have been sued collectively, or under section 1680 of the Code of 1851, if they were too numerous and it was imprac-

ticable to bring them all before the court, then one or more could have been sued, who could have defended for the whole, provided Tracy acted as their agent. * * * None of these things were done.''

This method of procedure was reaffirmed in Hanley v. The Elm Grove Mut. Tel. Co., 150 Iowa 198, 201, 129 N. W. 807, 808. No other defendant was named. The defendant was a voluntary association of farmers. In sustaining the dismissal of the petition, the court, through Evans, J., said:

''If the plaintiff had made the members of the association, or possibly a majority of them, including the officers, parties defendant, we would not question the propriety of his including the entire association under its adopted name also. But he has named no person as defendant either as member or officer.''

In Presbyterian Church v. Johnson, 213 Iowa 49, 50, 238 N. W. 456, 457, the rule is repeated. It was a suit to quiet title, brought in the name of the church and its trustees, naming them. In affirming a decree for plaintiffs, speaking through Stevens, J., the court said:

''It is well settled in this state that actions may not be brought in the name of voluntary associations but must be prosecuted either in the name of trustees, if they exist; otherwise in the name of all of the members, or of a portion for the benefit of all. Both the church and the trustees are named as plaintiffs in this action.''

In Arts v. Guthrie, 75 Iowa 674, 677, 37 N. W. 395, 396, the plaintiffs, as trustees of a church, sued for a money judgment. By amendment the name of the church was also added. To the challenge that plaintiffs had no right to sue, the court said:

''The St. Peter and St. Paul Catholic Congregation was an unincorporated association, and, so far as the facts are shown, was not competent to join as party plaintiff; but that fact did not entitle the defendants to have the action dismissed.''

In Laughlin v. Greene & Weare, 14 Iowa 92, action at law was brought in the name of the plaintiff, as trustee, for the ''Trust Company.'' The court held this to be proper.

Appellants have cited a number of our decisions in support of their contentions but most of them are not applicable because of the reasons just given. In Drake v. Board of Trustees, 11 Iowa 54, an action at law was brought against the "Board" only, as a body. In Steamboat Pembinaw and Owner v. Wilson, 11 Iowa 479, 480, the court said that the legislature did not intend "that a suit could be brought in name of a steamboat, hotel, toll-gate or race-horse". In Marshalltown Mutual Plate Glass Ins. Assn. v. Bendlage, 195 Iowa 1200, 191 N. W. 97, 193 N. W. 448, a law action was brought in the name of the unincorporated association only. In Nightingale v. Barney, 4 Greene (Iowa) 106, the plaintiff had no interest in the note sued upon, and there was nothing but a moral consideration. In Work v. Des Moines Coliseum Co. and the Circus Committee of the Za-Ga-Zig Temple, 207 N. W. 679 (apparently not included in the Iowa Reports), the first-named defendant was a corporation. The Za-Ga-Zig Temple was an unincorporated association, and the defendant committee was selected from the members of the order. They were not named as defendants, either individually or in a representative capacity for the membership. The action was, of course, not properly brought except as to the first defendant. The real basis of the judgment, on a directed verdict as to both defendants, was that there was no negligence established against either.

In Wilson v. Airline Coal Co., 215 Iowa 855, 857, 246 N. W. 753, 754, the petition is long and involved, contains much about collective bargaining, and prays for an injunction against the breach by the defendant copartnership of a certain contract, signed by Wilson, President, U. M. W. of A. The petition does not allege that he was a member of the Local Union. The case was not decided on all of the grounds of the motion to dismiss. The court said it would "assume that there is neither a misjoinder nor nonjoinder of parties plaintiff, *and that some of the parties named have a right to maintain this action.*" (Italics ours.) The court held that there was no consideration for the contract, nothing promised and no obligation assumed on the part of district No. 13, want of mutuality both of obligation and remedy, and that the contract was void for indefiniteness and uncertainty. These were the grounds of dismissal.

The cases of Haldeman v. Addison, 221 Iowa 218, 265 N. W. 358, and Lewis v. Tilton, 64 Iowa 220, 19 N. W. 911, 52 Am. Rep. 436, relied upon by appellants, are not in point. The decision in each being as to the personal liability of one who makes an agreement for an unincorporated association.

In the case before us, the plaintiffs fully complied with the proper procedure as prescribed by the statutes, and the decisions of this court. Both the International Brotherhood, and the Local Union and three of its officers were named as defendants, officially, and individually as representatives of the entire membership, as provided by Code section 10974.

■ Furthermore, the defendant Union in the first paragraph of the contract with the McCoy Company states that it "agrees to be bound by the following terms and provisions * * * ." It contracts as an entity, and not merely as a group of men. The contract is drawn in the customary form of such instruments. No doubt the International Brotherhood and its hundreds of Locals have many thousands of these contracts in force. Why would such contracts be executed if the Unions did not think them binding and enforceable on all parties? This was a "closed shop" contract. Because of this contract and others like it with other freight haulers, none of these plaintiffs was able to get work from the day of their suspension from the defendant Union until their reinstatement. The contract was made for their benefit, but the wrongful conduct of the defendants deprived them of its benefits. The defendant having forced the execution of the contract, and secured whatever advantage it was to them, and bound itself to perform its provisions as an entity, is estopped to deny that character, in order to avoid liability for conduct wrongful and injurious to plaintiffs. Lamm v Stoen, 226 Iowa 622, 284 N. W. 465, 121 A. L. R. 627, supra. Their membership rights and their rights under this contract with their employer were valuable property rights of which they were wrongfully deprived by the acts of the defendants. Such rights are guaranteed by the Fifth Amendment of the Federal Constitution. Cameron v. International Alliance, 118 N. J. Eq. 11, 18, 176 A. 692, 696, 697, 97 A. L. R. 594. " 'There is no more sacred right of citizenship than the right to pursue unmolested a lawful employment in a lawful

manner. It is nothing more nor less than the sacred right of labor.' '' Connors v. Connolly, 86 Conn. 641, 651, 86 A. 600, 604, 45 L. R. A., N. S., 564. As stated by the Pennsylvania court, the right of a workman to the "free use of his hands" has been described as one "of which the legislature cannot deprive him, one which the law of no trades union can take from him, and one which it is the bounden duty of the courts to protect." Erdman v. Mitchell, 207 Pa. 79, 91, 56 A. 327, 331, 63 L. R. A. 534, 99 Am. St. Rep. 783; Cameron v International Alliance, supra.

In a case similar to the one before us, Fleming v. Moving Picture Machine Operators, 16 N. J. Misc., 502, 510, 1 A. 2d 850, 853, wherein the court decreed reinstatement of a member of the Union, because of his wrongful expulsion, in speaking of membership in the Union being a property right, said:

"To deprive him of his membership in this union would mean that he could not work at his chosen trade or profession in Essex county and because of the control of like positions in other North Jersey counties by affiliated locals, the chances of employment would be slim indeed. This field of employment is under the complete and absolute domination of the defendant union and affiliated locals. * * * The members of this union are not slaves to capital, their employers, but they are virtually slaves to the business agent and the officers of the union by whom they are dominated in a wholly arbitrary and autocratic manner." (Affirmed 124 N. J. Eq. 269, 1 A. 2d 386.)

Decisions involving labor unions supporting holding of the trial court on this particular issue are Taff Vale Ry. Co. v. Amalgamated Society of Ry. Servants, 17 Times L. R. 698, 50 Week. Rep. 44, 1 British Ruling Cases 832 (House of Lords); United Mine Workers of America v. Coronado Coal Co., 259 U. S. 344, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762; Cameron v. International Alliance, 118 N. J. Eq. 11, 176 A. 692, 97 A L. R. 594; Malloy v. Carroll, 287 Mass. 376, 191 N. E. 661; Branson v. I. W. W., 30 Nev. 270, 95 P. 354; Syz v. Milk Wagon Drivers' Union, 323 Mo. 130, 18 S. W. 2d 441; Mayes v. United Garment Workers of America, 320 Mo. 10, 6 S. W. 2d 333; Heasley v. Operative Plasterers & Cement Finishers International Assn., 324 Pa. 257, 188 A. 206; McClees v. Grand International Brotherhood of Locomo-

tive Engineers, 59 Ohio App. 477, 18 N. E. 2d 812; McCantz v. Brotherhood of Painters, Tex. Civ. App., 13 S. W. 2d 902.

It appears to the court, that for all of the reasons urged the defendant Union, both International and Local, though not by name alone, was suable, and was properly sued. Such organizations are recognized by the law, both by legislation and by decisions of the court. Being so recognized they cannot be above the law. They may acquire and own property, operate through agents and servants, and inflict injury. It then becomes merely a formal question of procedure. This question was solved many years ago. The common law rules of practice and procedure were too inflexible for practical purposes when applied to such orders and societies. But the rules and the procedure in suits in equity were purposely adapted to meet the difficulties presented by a multiplicity of persons interested in a subject matter of litigation, whether prosecuting or defending. Officers or members of the unincorporated association fairly and properly representing it were allowed to sue and be sued on its behalf, and for themselves, and for the other members, and all others having the same interest. Such procedure is a part of the statute law of Iowa.

VII. The grounds of the various motions of defendants filed prior to answering were based upon the alleged misjoinder of a claim for damages in the suit for mandamus. We think the matter has been disposed of contrary to the contention of the appellants by statute, decision of the court, and by procedure in equity.

Section 12445, Code, 1939, provides:

" 'Enforceable duty' defined. If such duty, the performance of which is sought to be compelled, is not one resulting from an office, trust, or station, *it must be one for the breach of which a legal right to damages is already complete at the commencement of the action,* and must also be a duty of which a court of equity would enforce the performance." (Italics ours.)

Section 12450 of that Code provides:

"Injunction may issue — joinder. When the action is brought by a private person, it may be joined with a cause of action for such an injunction as may be obtained by ordinary

proceedings, *or with the causes of actions specified in this chapter,* but no other joinder and no counterclaim shall be allowed." (Italics ours.)

Section 12451 of that Code provides:

"Peremptory order. When the plaintiff recovers judgment, the court may include therein a peremptory order of mandamus directed to the defendant, commanding him forthwith to perform the duty to be enforced, *together with a money judgment for damages and costs,* upon which an ordinary execution may issue." (Italics ours.)

It appears to us that the duty owing to the plaintiffs arose from an office, trust, or station, and also that plaintiffs' cause of action is for the breach of a duty for which a legal right to damages was complete at the commencement of the action, and was enforceable in equity. The damages suffered arose from the breach of duty sought to be enforced. They are the result of that breach, and the breach must be first established before damages may be proved and recovered. By the enactment of these sections, it was plainly the intent of the legislature that the matter of the issuance of the writ, and the recovery of damages should be determined in the equitable action, and that the parties and the court should not be put to the expense and trouble of two independent actions. It has been held that damages for an illegal expulsion may be awarded on mandamus proceedings under a statute such as section 12451. See People ex rel. Solomon v. Brotherhood, 169 App. Div. 595, 155 N. Y. S. 438. Also that a judgment in a mandamus proceeding reinstating an expelled member is conclusive evidence of wrongful expulsion. Merscheim v. Musical, etc., Union, 55 Hun 608, 8 N. Y. S. 702, 24 Abb. N. C. 252, 29 N. Y. St. Rep. 235.

These sections were construed by the United States District Court for the Northern District of Iowa, in Mystic Milling Co. v. Railway Co., 132 F. 289, 293. Therein Reed, J., said:

"Counsel for defendants urge with much persistency that plaintiff's actions are primarily for the recovery of damages, and that under section 4349 a judgment for such damages is essential to warrant a judgment of mandamus. * * * Essentials

1052

of the action of mandamus under the Code are: (1) A duty enjoined by law upon the defendant, in the performance of which the plaintiff, if a private individual, has a personal interest; (2) a breach or nonperformance by the defendant of such duty; (3) a legal right in the plaintiff to damages because of such nonperformance; (4) absence of any other adequate remedy in the ordinary course of the law. The right to damages, then, is essential to enable the plaintiff to maintain the action. The reason is apparent, for, if he has suffered no damage, or will not suffer any, he can have no interest (as a private individual) in the performance of the duty. State ex rel. v. County Judge, 2 Iowa, 280. The right to damages and a judgment therefor are not the same. The latter may be waived, but the former is essential to the existence of the cause of action, and its maintenance by the plaintiff; and, if such right does not exist, he cannot have judgment for the order (writ) of mandamus. Then section 4349, 'When plaintiff recovers judgment.' For what? Plainly establishing the duty to be performed, for, if defendant owes no duty, there is none to be performed, and there could be no breach of any by him, or resulting damage to the plaintiff. The court then, on entering judgment establishing such duty, may include therein a peremptory order (writ) of mandamus, directed to the defendant, commanding him forthwith to perform the duty to be enforced (this being the means of enforcing such a judgment), together with a money judgment for damages and costs, upon which an ordinary execution may issue. The plaintiff's right to recover damages, then, plainly depends upon the recovery of judgment establishing the duty to be performed by defendant, and that there has been a breach thereof, for this is a prerequisite to his right to such damages. The conclusion is unavoidable that the action authorized by this chapter is primarily to enforce some duty resting by law upon the defendant, and for an order (writ) of mandamus compelling the defendant to perform such duty, and that the recovery of damages is but an incident of such action, which, if claimed, may be included in the judgment establishing the duty.''

The question was before this court in Thurber v. Duckworth, 165 Iowa 685, 691, 147 N. W. 158, 160. This was an action under

the Soldier's Preference Law for a wrongful discharge. It is true that the statute provided that the soldier was entitled ''to a right of action therefor in any court of competent jurisdiction for damages, and also a remedy for mandamus for righting the wrong.'' This language does not provide that the two remedies must be prosecuted in the same cause, and the court in granting the writ and assessing the damages in the single action does not purport to so find, but bases its right to do so upon the statute and upon the principle that equity, having assumed jurisdiction, retains it, to grant all the relief to which plaintiff is entitled. This is apparent from the language of the court on pages 695 and 696 of the Iowa report, page 162 of 147 N. W., to wit:

''It is next contended that the court erred in rendering judgment against the defendant for damages in an action in equity, for the reason that the defendant was entitled to a trial by jury, as in a law action on the question of damages, and that there was therefore a misjoinder of parties and a misjoinder of causes of action. The answer to this is found in the statute itself, in which it is provided that he may have a remedy by mandamus for the righting of the wrong, the wrong consisting in his discharge in violation of the statute, and also a right of action for damages. There is but one wrong. That is involved in the act of discharge. Mandamus remedies the wrong by requiring the restoration to the position from which he was wrongfully discharged. The damages are an incident to the wrong. Equity, having assumed jurisdiction to right the wrong, may retain jurisdiction to grant all the relief to which the party is entitled, traceable to the wrong involved. Equity having assumed jurisdiction, retains jurisdiction to grant all the relief, which, under the facts, the party is entitled to; and this to avoid a multiplicity of suits.

''The court is not without authority for this proceeding. The case of People v. Ahearn (Sup.) 121 New York Supp. 819, supports this view. Bell v. Thomas, 49 Colo. 76 (111 Pac. 76, 31 L. R. A. (N. S.) 664); McClure v. Scates, 64 Kan. 282 (67 Pac. 856). But, independent of these cases, the general rule is, for which no authority need be cited, where a wrong has been done, and the aid of a court of equity is involved to right the wrong, that, having secured jurisdiction for this purpose, it may and will retain jurisdiction, even to the extent of granting relief, which independ-

ently could be granted only in an action at law. This is done upon the theory that a court of equity ought not, and, therefore will not, turn one away to seek relief in a court of law which can be granted in the very proceeding then before that court. We think there is nothing in defendant's contention on this point.''

██ VIII. There seems to have been little, if any, dispute as to the actual damages from time lost by each plaintiff. Damages are also recoverable for wrongful expulsion and may include such sums as will compensate him for the mental suffering and humiliation caused thereby. See St. Louis S. W. Ry. Co. v. Thompson, 102 Tex. 89, 113 S. W. 144, 19 Ann. Cas. 1250. We have noted some, but not all matters, indicating that there was some feeling of prejudice or ill will against the plaintiffs, which in all probability had its influence in the matter of the suspension of the plaintiffs, and the manner thereof, aside from their claimed disobedience of the strike order. We had these matters in mind when we stated herein that any further demand for reinstatement before suit, and any appeal within the order, would have been futile.

We have given careful consideration to all matters argued by appellants, and it is our judgment that the judgment and decree appealed from ought to be and it is affirmed.—Affirmed.

HALE, C. J., and STIGER, SAGER, MILLER, WENNERSTRUM, and OLIVER, JJ., concur.