**AMERICAN FEDERATION OF LABOR et al. v. MANN et al.**

No. 9446.

Court of Civil Appeals of Texas. Austin.

April 4, 1945.

On Rehearing May 9, 1945.

Second Rehearing Denied May 30, 1945.

278

Joseph A. Padway and Herbert S. Thatcher, both of Washington, D. C., Sewall Myer, of Houston, Leonard Brown, of San Antonio, and Hart & Brown, of Austin (by James P. Hart, of Austin), for appellants American Federation of Labor et al.

Lee Pressman and Martin Raphael, both of Washington, D. C., Maurice Sugar and Ernest Goodman, both of Detroit, Mich., Arthur Mandell and Herman Wright, both of Houston, and William Standard, of New York City, for appellants Congress of Industrial Organizations et al.

Grover Sellers, Atty. Gen., and Fagan Dickson, Asst. Atty. Gen., for appellees Gerald C. Mann et al.

BAUGH, Justice.

The American Federation of Labor, certain affiliated Labor unions, and several individuals sued the Attorney General, the Secretary of State, and all District and County Attorneys of the State of Texas, under the Uniform Declaratory Judgment Act of Texas, art. 2524—1, Vernon's Ann. Civ.St. to test the constitutionality of Acts. Reg. Sess. 48th Leg., 1943, c. 104, known as H.B. 100, Vernon's Ann.Civ.St. art. 5154a; and for injunctive relief against prosecutions thereunder. The Congress of Industrial Organizations, and certain affiliated unions and individuals filed a similar suit against the same defendants, seeking the same relief, and these suits. were consolidated and tried to the court without a jury. The trial court held Secs. 4, 7 and 10a of said Act unconstitutional,. but upheld the other provisions of the Act,. and denied the injunctive relief sought, from which judgment this appeal is prosecuted.

It is to be noted also that since this appeal was taken the Supreme Court of the United States has (Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 328, 89 L..

Ed. ——) in a 5 to 4 decision, held that Sec. 5 of said Act, as applied under the facts of *that particular case,* "contravenes the Constitution"; but with the express reservation: "Nor do we undertake to determine the validity of Section 5 in any other application than that made upon the facts of this case." In the same opinion the court recognizes the power of the State to require registration of a paid labor organizer under such circumstances "as when he undertakes the collection of funds or securing of subscriptions, he enters a realm where a reasonable registration or identification requirement may be imposed." The Supreme Court of Texas held that Sec. 5 (Ex parte Thomas, 141 Tex. 591, 174 S.W. 2d 959) required only that; and was designed for the protection of both labor and the public against abuses, impostors, fraud, or paid organizers who might not be accredited agents of the union they purported to represent. Thus the application of Sec. 5, as a registration statute, to paid labor organizers who solicit members through other methods than those used by Thomas in the cited case—that is, otherwise than as a part of a public speech to assembled employees —is left entirely undetermined; but with the implication that it is valid if properly applied, and invalid only when applied in an improper and unauthorized manner. From the foregoing opinions we conclude that Sec. 5 of the Act is a valid exercise by the State of its police power, and requires registration as therein provided of all labor union organizers as defined in Sec. 2 of said Act; but that such registration is not necessary as a prerequisite to, nor a limitation upon, the constitutional right of free speech as defined and considered in Thomas v. Collins, supra.

■ We are confronted at the outset, and before considering the other provisions of the Act itself, with the contentions of appellees, seasonably raised by proper pleas in the trial court, that this is a suit against the State not maintainable under the Uniform Declaratory Judgment Act, Acts 1943, 48 Leg. p. 265, Ch. 164, Vernon's Ann.Civ. St. art. 2524—1, against the state without its consent, which consent has never been granted. It may be conceded that the same rule of state immunity from suit without its consent applies to suits under the Uniform Declaratory Judgment Act as applies to other suits. Hoyt v. Board of Civil Service Com'rs, 21 Cal.2d 399, 132 P.2d 804; Bell Tel. Co. v. Lewis, 313 Pa.

374, 169 A. 571; Empire Trust Co. v. Board of Commerce and Nav., 124 N.J.L. 406, 11 A.2d 752; 16 Am.Jur., p. 331, Sec. 61; Anderson Declaratory Judgments, p. 119, Sec. 40. It is to be noted also that the Declaratory Judgment Act itself authorizing in Sec. 2 thereof, "any person interested," etc. to bring such a suit, specifically defines in Sec. 13 what is meant by "person" as used in the Act, and significantly omits from such term any reference to the State as a party against which such suit may be brought.

■ The appellees rely on the cases of Stephens v. T. & P. R. Co., 100 Tex. 177, 97 S.W. 309; and Walsh v. University of Texas, Tex.Civ.App., 169 S.W.2d 993, in support of their contentions that the instant case is one against the State, urging that the suit is primarily and fundamentally to test, by declaratory judgment, the validity of the law; and that the injunctive relief sought is but ancillary. The appellants, on the other hand, emphasize their contention that their suit is one for injunction against the enforcement of penal act which is unconstitutional; and that jurisdiction is referable to the cases holding that suits against state officers to restrain their action under an unconstitutional law is not a suit against the State, citing particularly Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714, 13 L.R.A.,N.S., 932, 14 Ann.Cas. 764, and numerous Federal decisions following it; and Stanley v. Schwalby, 85 Tex. 348, 19 S.W. 264; Terrell v. Middleton, 108 Tex. 14, 191 S.W. 1138, 193 S.W. 139; Id., Tex.Civ.App., 187 S.W. 367; Anderson, Clayton & Co. v. State, 122 Tex. 530, 62 S.W.2d 107; National Biscuit Co. v. State, Tex.Civ.App., 129 S.W.2d 494. There has in the past been some confusion as to the line of demarcation between these two lines of decisions, but there now seems to have been evolved a fairly well settled rule. Even though the State have an interest in the vindication of its laws, unless the property or contract rights of the State, or its rights to collect taxes levied by such law, be foreclosed by the judgment, the suit is not forbidden. That is, the subject matter "must be an interest of value in a material sense to the state as a distinct entity." 49 Am. Jur., p. 307, Sec. 94. Neither the State's property nor its taxing power is involved in the instant case.

■ On the other hand, suits against state officers, "where the action is for re-

lief against statutes claimed to be unconstitutional" is not deemed to be a suit against the State, even though the judgment be binding on the State. Such a rule has been almost uniformly recognized. See authorities above cited; 49 Am.Jur., p. 310, Sec. 95, and numerous cases cited in note 10 thereunder.

■ Nor does the fact that the suit here is one under the Declaratory Judgment Act, and injunctive relief sought as ancillary thereto, remove the instant case from the rule. While the most usual method of invoking such rule is through injunction or habeas corpus; in each instance the real issue before the court is the same—the constitutionality of the law involved. In the instant case the primary issue to be adjudicated is the same as if appellants had sought primarily only injunctive relief, instead of first a declaratory judgment and injunctive relief based thereon. In either case the court must first determine the validity of the law in question, and the right to an injunction, vel non, must depend upon the determination of that issue. Hence we see no distinction in principle in applying such rule as to immunity whether the suit be for injunction primarily or as ancillary if the right thereto in either or both instances be the same. We conclude, therefore that the instant case is ruled by the Federal cases following Ex Parte Young and the state cases following Stanley v. Schwalby and Terrell v. Middleton, supra; and that the trial court had jurisdiction to try same without legislative consent being first obtained to bring this suit.

■ We now come to the contentions made by appellants. The first may be disposed of before setting out the several provisions of the Act,—such contention being that the State does not have the power, under Art. I, Sec. 8 of the State Constitution, Vernon's Ann.St. and the Fourteenth Amendment of the U. S. Constitution, "to impose *any* previous restraint upon the exercise of civil liberties" by appellants, as the Act in question undertakes to do. Without any extended discussion of this issue here, or of the cases cited and reviewed at length in appellants' brief as supporting such contention, the following language of the Supreme Court of the United States in Thomas v. Collins, supra, is, we think, conclusive: "That the State has power to regulate labor unions with a view to protecting the public interest is, as the Texas court said, hardly to be doubted. They cannot claim special immunity from regulation," so long as such regulations do not "trespass upon the domains of free speech and free assembly." Only to the extent that such regulation, if otherwise reasonable, does so trespass is it unauthorized.

The next contention presented is that without regard to the civil rights involved, the Act denies due process and impairs obligations of contract in violation of Art. I, Sec. 10 of the U. S. Constitution. This contention relates to several provisions of the law and requires detailed consideration. It is not deemed necessary to here quote the full text of the Act but only those portions specifically attacked and which may properly be considered. The Act, in brief, provides:

Sec. 1 declares the public policy of the State and that labor organizations affect the public interest.

Sec. 2 defines the terms used in the Act, of which no complaint is made.

Sec. 3 provides: "It shall be the duty of every labor union to file with the Secretary of State, annually, and not later than the first day of February, except as hereafter provided, a report containing, (a) the name and address of such union; (b) the name and address of its local officers; (c) the name and address of the State, national, and international organization or union, if any, with which it is affiliated; (d) a complete financial statement of all fees, dues, fines, or assessments levied or received, together with an itemized list of all expenditures, with names of recipients and purposes therefor, covering the preceding twelve (12) months; and, (e) a complete statement of all property owned by the labor union, including any moneys on hand or accredited to such union, which said report shall be duly verified by the oath of the president, secretary, or some other regularly selected and acting officer of the union acquainted with the facts therein stated. Provided, however, that any union which closes its books at a date not convenient to file not later than the first of February may file such reports once each year as provided, and the Secretary of State shall set the time for such filing at a time convenient to the union. Each such labor union shall file with its first such report, duly attested copies of its constitution, or other organization papers and records, and shall thereafter report any changes or amendments to such constitution or organ-

ization papers and records within twenty (20) days after such changes are made.

"Such reports shall be available only to the Secretary of State, the Commissioner of Labor Statistics, and the Attorney General but shall also be open to grand juries and judicial and quasi-judicial inquiries in legal proceedings."

Sec. 4 regulates election by a union of its officers. This section was held invalid by the trial court, of which appellees do not complain.

Sec. 4a prohibits an alien or a convicted felon whose citizenship has not been restored from holding any office in a union or acting as a labor organizer.

Sec. 4b prohibits unions from making any financial contribution to any political party or to any candidate for political office as part of its or his campaign expenses.

Sec. 5 relates to registration of labor organizers, already referred to, set out and discussed in full in Ex Parte Thomas and in Thomas v. Collins, supra, and need not be further considered here.

Sec. 6 requires all unions to file with the Secretary of State a copy of all working agreements which provide for check off of union dues; and making same available only to the Secretary of State, the Commissioner of Labor Statistics, grand juries, judicial and quasi-judicial inquiries.

Sec. 7 relates to fees, dues, fines and assessments, was held invalid by the trial court, and no complaint here made of that portion of the judgment.

Sec. 8 provides: "Advance Fees. It shall be unlawful

for any labor organizer, union official or officer, or member of a labor union, or their agents, to collect any fees, dues, or sum of money whatsoever, in respect to membership in a labor union, or for the privilege to work or as a permit to work, from any person, without giving such person at that time a receipt therefor signed by such labor organizer, union official or officer, or member of the labor union, or their agent, reciting that such sum of money so received is to be delivered to the labor union, and be held intact until said person has been duly elected, and has become a bona fide voting member of said labor union. Provided that it shall be unlawful for any labor organizer, union official or officer, or member of a labor union, or their agents to collect any fee for the priv-

ilege to work or as a permit to work and no charge shall ever be made nor shall any fee ever be collected for the privilege to work in this State. Provided, however, this shall not prevent the collection of reasonable initiation fees as provided in this Act. Upon the payment in full by an applicant for membership in a labor union of any and all initiation fees or dues regularly assessed by such union, such labor union shall (a) elect such applicant to membership, or (b) shall forthwith return in full said money thus paid by the applicant. Upon such election, however, such advance fees thus paid may be applied by the labor union to the purposes and uses for which same were advanced. All unions, its members, officers, or agents, shall collect all fees in good faith, and no union shall elect a person to membership merely for the purpose of obtaining his initiation fee. Neither shall any labor union engage in the practice of collecting initiation fees from members and proceeding thereafter to discharge, suspend or drop such member, or cause his employer to discharge such employee, without reasonable and just cause. If any labor union shall engage in such practice, it shall be guilty of a violation of this Act, and shall be subject to the civil penalties herein prescribed. Nothing hereinabove stated shall be construed to prevent a closed shop contract or other type of bargaining agreement or to limit the bargaining power of a labor union."

Sec. 8a prohibits unions or their officers from demanding or collecting work permit fees from any person not a member of the union.

Sec. 9 requires all unions to keep itemized books of accounts showing all receipts and expenditures and makes them subject to inspection by any member of the union, by the Attorney General or his agent and open to grand juries, and judicial and quasi-judicial inquiries in legal proceedings.

Sec. 10 provides: "Members' Rights. It shall be unlawful for any labor union to refuse to give any person desiring membership therein a reasonable time, after obtaining the promise of employment, within which to decide whether or not he desires to become a member of such labor organization, as a condition to such person's employment by the employer. It shall also be unlawful for any labor union to expel any member thereof except for good cause, and upon a fair and public hearing by and within the organization, after due no-

tice and an opportunity to be heard on specific charges preferred. Any Court of competent jurisdiction upon his petition therefor, shall order reinstatement of any member of the labor organization who shall be expelled without good cause."

Sec. 10a was declared invalid by the trial court and no appeal is prosecuted from that portion of the judgment.

Sec. 11 prescribes a civil penalty of $1,000 against any union for each violation of the Act; and a $500 fine and/or 60 days in jail against any labor organizer or union officer for violation of any provision of said Act.

Sec. 12 gives district courts, upon application of the State, power to enforce the Act through injunction or other appropriate writ.

Sec. 13 makes it the duty of the Attorney General and of the District and County Attorneys to enforce the Act both as to civil penalties and criminal prosecutions.

Sec. 14 prescribes a liberal construction of the Act to effectuate the purposes expressed in the preamble.

Sec. 15 contains a separability clause with respect to constitutional invalidity of any portion thereof; and

Sec. 16 the emergency clause.

■ Granted the power of the State, in the interests of the public, to regulate labor unions, the generally accepted and approved test applicable to the exertion of that power, in determining whether such exercise conforms with due process, is to ascertain and determine whether the law be reasonable, not arbitrary nor capricious, and whether the "means selected shall have a real and substantial relation to the object sought to be attained." Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 511, 78 L.Ed. 940, 89 A.L.R. 1469; St. Louis Southwestern Ry. Co. v. Griffin, 106 Tex. 477, 171 S.W. 703, L.R.A.1917B, 1108; Spann v. City of Dallas, 111 Tex. 350, 235 S.W. 513, 19 A.L.R. 1387; 9 Tex.Jur., § 80, p. 508; 11 Am.Jur., §§ 302–303, pp. 1073–1078.

■ It is to be noted also that, except perhaps as to Sec. 4a which will be hereafter adverted to, the Act in question is regulatory, not prohibitory. It nowhere purports to prohibit freedom of the press, freedom of assembly for any lawful purpose, or freedom of petition, freedom of speech. Being regulatory, rather than prohibitory in nature, the test to be applied to the Act in determining its validity is that of its reasonableness, and not the "clear and present danger" doctrine applicable to prohibitions or restraints upon the exercise by *individuals* of freedom of speech, of the press, and of religion, laid down in Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470; Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192; and in West Virginia State Board of Education v. Barnett, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674. It is now well settled that as to labor unions, though voluntary unincorporated associations, regulations of unions as such is severable from and does not constitute a regulation of the individuals composing such union. As "separate functioning institutions" they have been granted many substantive rights applicable to them as such, separate and distinct from the individuals composing the membership, and also imposing upon them as unions regulations and responsibilities, not applicable to individuals. See United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542, 1548, 152 A.L.R. 1202, and illustrative laws there cited in the footnote.

■ Considering now the particular sections of the Act, we are of the opinion that subdivision (d) of Sec. 3 is an unwarranted and unreasonable requirement, imposing undue burdens upon unions not demanded by the public interest, particularly as to small unions with limited membership, and not essential to the operation and enforcement of the other valid provisions of the Act. This subdivision covers many matters relating to detailed internal operations of such unions, entirely legitimate, and as to which no question is raised. It was obviously intended to be correlated to Sec. 7, which latter section related to and sought to regulate fees, dues, fines and assessments; and to furnish information upon which Sec. 7 could be applied and enforced. Sec. 7, however, was held invalid, and as a result there appears no rational basis for requiring such unions to furnish the extensive detailed information obviously intended for use in connection with said Sec. 7. Sub. (d) of Sec. 3 must therefore fall as being without a rational basis and as not having "a substantial relation to the object sought to be attained." As to subdivisions (a), (b) and (c) of said Section obviously they invade no sphere of a union's activity, and impose no undue

or unreasonable requirements of which any legitimate institution could complain. And if, as is now definitely settled, the State may regulate labor unions, it cannot do so either fairly or effectively, without knowledge of what the constitution of such union, the basis law under which it operates, provides. Such a requirement would disclose no secret nor confidential information to the injury of such union; and would be no more onerous in principle than requiring, as the law Vernon's Ann.Civ.St. Art. 1302, Sec. 83, which authorizes the incorporation of labor unions does, the filing with the Secretary of State of a copy of its charter.

As to Sec. 4a the second amended original petition of the plaintiffs, on which trial was had, presents no immediate state of facts constituting a present justiciable controversy upon which a declaratory judgment may be rendered. Nowhere is it alleged that any of said unions have elected or employed any alien or convicted felon whose citizenship has not been restored as an official or labor organizer of any union; nor that any such election or employment is contemplated. There is not, therefore, presented any justiciable issue in this regard. Absent such issue it is a settled general rule, unless the statutes provide otherwise, that the Uniform Declaratory Judgment Act does not authorize courts to render merely advisory opinions on a contingent state of facts which do not presently exist and which may or may not arise, such questions being regarded as abstract or hypothetical. See 16. Am.Jur., § 9, p. 282, § 19, p. 293; Anderson, Declaratory Judgments, Sec. 7, p. 22, § 59, p. 167, § 61, p. 174. We are not, therefore, required to render such judgment here.

Nor is Sec. 4b subject to the criticisms lodged against it by appellants. Few subjects have been deemed more essential to the preservation, protection and operation of our democratic form of government than the free and untrammeled selection by the people of their public officials. This on the principle that such officials represent all of the people, and not merely the interests of any particular party, group or class. To that end laws are designed to prevent their becoming unduly amenable to, or subject to undue control or influence by, any particular group when the interests of such group affect the public interest. Such campaign contributions by corporations have long been

forbidden. See Texas R.C.S. Arts. 1349–1352; Texas P.C. Arts. 213, 214, 265; 2 U.S.C.A. § 251. And in 1943 the Federal Corrupt Practices Act, 2 U.S.C.A., § 241 et seq., was amended to expressly include "labor organizations" within such prohibited class of campaign contributions. Obviously the same power to so regulate, need for such regulation, and reasons therefor would apply to the State as in the case of federal regulation.

Clearly the language of this section of the Act cannot be reasonably construed as applying to, or limiting the rights of, the members of the unions as individual citizens; nor to prohibit the rights of the union to educate or inform its members as to the merits or demerits of any candidate, or of any political party. It applies only to financial contributions by "any labor union" to a party or a candidate for political office in its capacity as a "separate functioning institution" as distinguished from the individuals who compose it. See United States v. White, supra. As such, the State was clearly authorized to so regulate such unions.

We fail to see any reasonable relation between the requirements of Sec. 6 of said Act and the objective sought to be attained by the Act. Just wherein the public interest requires that only contracts between employers and unions which contain check-off provisions be filed with the Secretary of State does not appear. Nowhere does the Act condemn nor undertake to regulate or prohibit such check-off contracts. Whether or not deduction by the employer of the union dues of the members concerned is to be made or not would seem to be entirely a matter of contract between the parties, dependent upon the consent of the members, acting through their accredited representatives, on the one hand; and that of the employer, on the other. Such a provision, made with the consent of the employees, might inure to the benefit and convenience of both the union and the individual members, and if agreed to by the employer, appears to come within the contemplation of the National Labor Relations Act. See 29 U.S.C.A. § 151 et seq. Being a legitimate arrangement between employers and unions, and a right of contract neither denied nor limited by law; we see no more reason to require that such contract be filed with the Secretary of State than for the filing of any other valid and au-

thorized contract between the parties, none of which are required. This provision, therefore, in our opinion, imposes a burden upon unions, for which no rational basis exists, is not necessary to protect any disclosed public interest, to preserve any freedom of contract, and not designed to disclose nor correct any declared abuses. Not having a legitimate relation to the purposes of the valid provisions of the Act, it must be held to be arbitrary, unreasonable and invalid.

Sec. 8a appears to cover in part and make more specific some of the same provisions contained in Sec. 8. Sec. 8 contains in the main two regulations, one of which is in effect reiterated in Sec. 8a. There is an apparent conflict or inconsistency between the provisions of the first sentence of Sec. 8 and the second sentence of that section, as well as with the provisions of Sec. 8a. The first sentence provides that it shall be unlawful to collect from a laborer any fees, dues, etc., with respect to membership in a union "or for the privilege to work or as a permit to work," without giving to such laborer the prescribed receipt therefor, thus impliedly authorizing collection of a work permit fee; whereas, the second sentence of 8 and the provisions of Sec. 8a expressly prohibit collection at all of a work permit fee. In view of the express language of Sec. 8a and of the second sentence of Sec. 8, prohibiting collection of work permit fees, the portion of the first sentence requiring a receipt for such fees may be disregarded as surplusage. The requirement that a solicitor of union memberships, give an applicant for such membership a receipt for the moneys so received as fees or dues of the union; and unless such applicant is elected to membership that his money be refunded to him, obviously but comports with honesty and fair dealing, and operates as a safeguard against imposition and fraud upon those seeking membership.

As to the inhibition against unions collecting work permit fees from nonunion employees, appellants urge that it will destroy two traditional and commonly accepted labor union practices, both of long standing. One is the practice of charging nominal fees of apprentices employed in shops or trade schools operated or financed by a craft union. These training periods for apprentices run from one to five years, and the charge made is for supervision, training and guidance by expert craftsmen of the union, while the apprentice acquires that degree of skill which will entitle him to membership in the union; and during which the apprentice receives certain benefits of union contracts. This contention is, we think, clearly not tenable. Such apprenticeship charges are comparable to tuition charged for supervision and instruction of student workers by skilled workmen, presumably competent to do so. They are obviously not fees charged a qualified laborer for the right to work within the meaning and contemplation of the Act; and the inhibition in the Act cannot be reasonably construed to apply to them.

The other class involved is nonunion laborers who are permitted upon payment of such work permit fees to work on closed-shop contract jobs. Closed-shop contracts are expressly recognized by Sec. 8 of the Act. As we understand the term, under a closed-shop contract, the employer cannot, without the consent of the union, employ any but union employees. It is the contention of appellants that unions have for years charged workmen who were not, and did not want to become, union members, pay initiation fees and dues, a work permit fee, as a condition of employment on a closed-shop job. It is sought to be justified as a part of the cost to such union in obtaining and maintaining union conditions and servicing the employees on the job. It does not seem to be controverted that the State would have the right to regulate the amount of such work permit fees. But the complaint here is against the prohibition entirely of such a charge.

The record shows that the general overall policy of such unions is not to build up a membership in numbers beyond what such unions can normally and reasonably keep adequately employed and properly service, under normal conditions. It was also shown that under the conditions created by war, particularly as to government construction of war plants, camps, training installations, etc., closed-shop contracts were obtained by unions, which, under the emergency conditions could not possibly be fulfilled by employment only of union members. In some such instances the large majority of the employees were nonunion, all of whom, before being permitted to work on such job, were required to pay a fee to the union for the privilege of working. Many of them could not qualify for union membership. Thus, in some in-

stances, according to the testimony of one witness, large numbers of nonunion employees were required to contribute to the union funds an amount fixed by the unions for the privilege of working on a closed-shop contract, without any voice as to union policy, union activity, or as to what was done by the union with the funds so exacted of them, or how much such permit fee should be. There was thus afforded not only a potential but an actual opportunity for large contributions to the treasuries of the unions, exacted from employees not members, who had no voice in union affairs; and opportunity thus afforded to maintain such unions, primarily for the benefit of their members, in part at least, from those who had no voice in union activities. Thus, in the last analysis, the exaction of a work permit fee, under such circumstances, could be deemed by the Legislature, as it evidently was, contrary to the policy expressed in the Preamble to the Act: "The right to work is the right to live."

Nor is the argument made by appellants that in closed-shop contracts, nonunion employees receive benefits in pay, working conditions, etc., as a result of union efforts, for which they should justly be required to pay, sufficient to make such a regulation arbitrary or unreasonable. There can be no doubt that through organization, united efforts, collective bargaining, and other legitimate means, the working conditions of the laboring man have been greatly benefited and improved as·the result of union efforts. It cannot be gainsaid that such benefits have inured to all labor, whether union or not. But enforced collection by unions from nonunion employees for such benefits as a right to work is another matter. Carried to its logical conclusion, the same reasoning would justify such exactions on any job wherein unions are involved, whether under closed-shop contracts or not; and ultimately could lead to the same policy towards all labor, on the ground that all labor had benefited from union efforts. Thus the public interest is so affected by the practice prohibited in Sec. 8a, and the potential abuses and injustices to laborers who are not members of an organized union, whether from choice or inability to become so, that the Legislature was warranted in forbidding such practice.

■ We find nothing arbitrary or unreasonable in Sec. 9. If the State has the power to regulate such unions, it may appropriately require them to keep accurate records of their proceedings and activities. The fact that it may, as urged by appellants, impose some additional burdens upon small unions whose books are kept without pay therefor by a member, does not make it unreasonable. The same is true of practically all tax statutes and other regulatory laws applicable to corporations, insurance companies, and various organizations entitled to exemptions. Nor are the inquisitorial rights provided in said section unreasonable. Such rights, at the instance of the State, even when such books may disclose violations of law, were expressly upheld in United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542, 152 A.L.R. 1202, as not being in violation of the provisions of the constitution against unlawful search and seizure, and against compulsory self incrimination. The immunity granted to the members in their individual capacities does not extend to the organization entity of which they are members.

■ The meaning of the first sentence in Sec. 10 is not clear. Apparently it was intended to apply, though it does not expressly so state, to closed-shop contracts, which are recognized in Sec. 8. It is an ambiguity to say that anyone who has expressed *a desire to join an organization* shall be given a reasonable time to determine whether or not he *desires to join it*. If by the language used is meant that where union membership is a condition precedent to employment, as is true in closed-shop contracts, and employment is promised on that condition, then that such laborer shall have a reasonable time in which to make up his mind, with no requirement in the law that he be permitted to work in the meantime (which the statute does not provide) the statute becomes meaningless. That right he is free to exercise without such provision. He can, if he chooses, join the union and take the job promised on that condition; or decide at his leisure whether he will do so or not. The law does not require that he be given employment, and a reasonable time thereafter in which to decide whether he will then join the union. It gives him a reasonable time, after *"obtaining the promise of employment"* in which to decide whether he will join the union. If the Legislature meant by the language used that such laborer must first be given work,

and then a reasonable time to determine the union membership question, then the result would be to require employment of laborers, not members of a union, on a closed-shop contract, recognized in the law itself as valid, thus impairing its terms, and running afoul of constitutional guaranties. For the reasons stated, we think that the first sentence of Sec. 10 must fall for indefiniteness and uncertainty.

■ The remaining portion of Sec. 10 is not unreasonable in that it requires no more than the constitution and by-laws of many unions already provide; and nothing more than what justice and fair play, under democratic principles, dictate and require of unions which do not so protect their members against injustice and arbitrary action. Nor does the Act invest the courts with powers which they do not already have in protecting personal and property rights of individuals in their membership. It nowhere relieves an aggrieved member of such union from first exhausting the channels for relief provided by the rules and regulations of his own union, before resort to the courts. See Grand International Brotherhood v. Marshall, Tex.Civ.App., 119 S.W.2d 908; Nissen v. International Brotherhood of Teamsters, 229 Iowa 1028, 295 N.W. 858, 141 A.L.R. 598 and Annotation; 4 Am.Jur. Sec. 28, p. 473, 31 Am.Jur. Sec. 69, p. 865.

■ It is further urged by appellants that Sec. 3 of said Act is unconstitutional because it imposes an undue burden on interstate commerce. This argument is based in large measure on the requirements set out in subparagraph (d) of said Section, which subparagraph we have heretofore held invalid. With that subparagraph eliminated, the remaining provisions of that Section do not impose any undue burden upon such unions. Even if it be conceded that the regulations imposed do affect interstate commerce, a question we do not find it necessary to decide, it is now settled that the State may, in the public interest, regulate various types of such activities, so long as such regulations do not run counter to federal regulations thereof, or where the Federal Government has not already preempted the field of regulation. The insurance business is a typical illustration. As stated in United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 1171, 88 L.Ed. 1440: "And there is a wide range of business and other activities which, though subject to federal regulation, are so intimately related to local welfare that, in the absence of Congressional action, they may be regulated or taxed by the states." See also 11 Am.Jur., p. 871, § 175. This principle is particularly applicable to the activities of labor unions, power to regulate which is expressly recognized in many decisions of the Supreme Court of the United States, specifically in Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. ——, and in regulatory laws enacted in many of the states. See Alabama State Federation of Labor v. McAdory, 18 So.2d 810, and the statutes and decisions therein referred to. The Act here under consideration does not invade the field of, nor conflict with, federal regulations. If state regulation should conflict with federal regulation in its appropriate field, then, of course, the state law must give way. 11 Am.Jur., p. 871, § 175, and cases cited; 15 C.J.S., Commerce, p. 271, § 14. But unless and until state regulation does so conflict or interfere with federal regulation in the National Labor Relations Act, the State may, under its police power, regulate the impact of union activities on local conditions. See 29 U.S.C.A. § 151, and numerous cases cited in note 10 of annotations thereunder.

It follows from what we have said that the judgment of the trial court holding Secs. 4, 7 and 10a of said Act invalid is not disturbed. In addition, we hold subdivision (d) of Sec. 3, Sec. 6, and the first sentence of Sec. 10 invalid. All other provisions of said Act, excluding those next above excepted, we hold valid and sustainable under the separability provisions of Sec. 15 thereof; and as thus modified the judgment of the trial court is affirmed.

Modified and affirmed.

## On Motions for Rehearing.

All parties to the appeal have filed motions for rehearing; and all urge that we erred in not passing on the validity of Sec. 4a of the Act in question, Vernon's Ann.Civ.St. art. 5154a. This for the reason that the pleadings of the CIO were sufficient to allege a justiciable controversy; that the evidence raised the issue; that all parties tried the case upon the theory and assumption that its validity was involved; and that therefore, under Texas Rules of Civil Procedure No. 67,

it should be deemed to have been pleaded. The amended petition of the A F of L does not contain any factual allegations raising the validity of Sec. 4a. However, a reexamination of the pleadings of the CIO discloses the following: "Members of plaintiff unincorporated associations who are aliens do and have volunteered for such work (solicitation of members) and have received and do receive such reimbursement and remuneration." The record of trial also shows that some unions along the Mexican border have officers and organizers who are aliens, some of whom do not reside in Texas, but live in Mexico and commute back and forth into and out of Texas in their work. On the issue of the need for services of aliens and felons in the operation of some unions, Howard McKenzie, Vice President of the National Maritime Union, a CIO affiliate, testified that such union was organized for both economic and political purposes. That while the union preferred not to have aliens and felons in places of leadership, if forbidden to do so, that union could not function in Texas. He testified, among other things, as follows:

"Q. I want to ask one more question about aliens and felons. I believe you said it would be destructive to your union if felons couldn't serve as officers and organizers; is that what you said? A. Yes; only I explained what I meant by that, because I don't want the record to show that we are in favor of hiring a murderer and what have you. As a matter of fact, we have had lots of gangsters; we had to expel out of our union thieves, gunmen, what have you; I said that there are members of our union who have been framed on felony charges and fines, because of their union activities. We know on the other hand that there are people whom we have expelled from the union that went around Texas ports a few years ago with guns on their hips, and murdered our people. Some of those people who fought for the union went to jail; they were the leaders of the union, and some of our present leaders are men who have been convicted for a crime, and I suppose if we went back to the childhood of all these people, we might have taken a loaf of bread when ten years old; that word 'felony' is a very broad term. We would not permit a person to hold office in our union where he was guilty of any crime which—and he could not hold a job unless we know he had the approval of the aver-age American citizen. In other words, there is nobody holds office in our organization who has done anything, and if he has done anything he still deserves a second chance and a right to function, and we can take any of our officers or any of our people on board ships and show you that to be a fact.

"Q. The same thing is true with aliens, —you couldn't function without aliens? A. So far as that law is concerned, incidentally, it would be very easy to frame the union leaders and convict them technically, and thereby break the union.

"Q. Your union couldn't function, according to your testimony, if you had citizens of the United States in your three branches in Texas instead of having felons or aliens there; is that your testimony? A. That was my testimony.

"Q. It was? A. Yes, sir."

In view of such pleadings and testimony, and the fact that the case was tried on the theory that a justiciable controversy as to Sec. 4a was presented, we now consider the validity of that section of the Act, which provides:

"Sec. 4a. It shall be unlawful for any alien or any person convicted of a felony charge to serve as an officer or official of a labor union or as a labor organizer as defined in this Act. This Section shall not apply to a person who may have been convicted of a felony and whose rights of citizenship shall have been fully restored."

Appellants urge that under the holding in Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 11, 60 L.Ed. 131, L.R.A.1916D, 545, Ann.Cas.1917B, 283, this section is clearly unconstitutional as discriminating against aliens, and denies "to aliens the opportunity of earning a livelihood * * *." That case held invalid an Arizona statute, Laws 1915, Initiative Measure, p. 12, which required "Any company, corporation, partnership, association or individual" employing more than five workers at any one time "regardless of kind or class of work, or sex of workers, shall employ not less than eighty (80) per cent qualified electors or native born citizens of the United States or some sub-division thereof"; and made it a penal offense for any such employer not to do so. That statute applied to all types of business, primarily to private enterprises, and restricted employment to native born citizens or qualified electors. As there pointed out even citizens of the

State might be neither native born nor qualified electors, yet they came under the ban of the statute, thus violating the equal protection provisions of the Federal Constitution. That statute did not purport to relate to the "common property of the citizens of the state" nor attempt to regulate an organization which the Legislature has declared "affect the public interest and are charged with a public use," as does the law here involved. In such cases it has been uniformly held that the state, under its police power, may prescribe reasonable regulations.

Sec. 4a in no sense denies any person the right to work or to earn a livelihood, whether he be alien or felon. It merely prohibits such persons from occupying a place of leadership, influence, and trust in a character of organization which admittedly affects the public interest both economically and politically. Clearly the public interest is vitally affected by the impact of such activities on local as well as national affairs; and in seeing to it that those activities are directed and conducted by men who have not been convicted of a felony, and who are in sympathy with American institutions, the state clearly has the right to provide appropriate safeguards to that end. It is a matter of common knowledge that during the present war strikes have occurred in essential war industries which have so impaired, or threatened to impair, prosecution of the war that the Federal Government has taken over their operation. This but emphasizes the vital public interest in the operation of unions and in the character of leadership thereof.

In the protection of the public interest numerous restrictions and limitations upon the rights and privileges of aliens and felons, not applicable to citizens, have been imposed and upheld. The most com-mon of these are denial of licenses to engage in certain professions affecting the public, to engage in the liquor business, etc.; to act as guardian of a minor who is a citizen; to act as an executor or administrator; to be employed on public works; to receive certain social security benefits, pensions, etc.; to vote; to hold public office; to serve as jurors. Nor is an alien subject to military service, if he elects to claim exemption therefrom. We need not cite statutes and cases so providing, nor do the instances above enumerated include all such denials to aliens or felons, not applicable to citizens, which have been recognized as within the power of the state to enact. These matters are discussed in 2 Am.Jur., p. 465, § 7 et sequens, to which we refer. Such restrictions and limitations upon the rights of aliens are in essence discriminations as between citizens and noncitizens, but they are grounded upon sound principles of public policy, designed for the protection and preservation of our fundamental institutions, and have long been recognized as a valid exercise of the police power of the state in matters affecting the public interest. Determination of what character of organization, enterprise, business, activity or operation affects the public interest is primarily a matter for determination by the Legislature; as is the extent of the regulation necessary to protect the public. So long as such regulation bears a reasonable relation to that end it is valid. We think there can be no doubt but Sec. 4a of said Act bears such reasonable relationship to the purposes and objectives of the law in question, and that it is a valid enactment.

To the extent indicated all of said motions are granted. In all other respects, they are overruled.

Granted in part and in part overruled.